# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| NORTHEAST PATIENTS GROUP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MAINE DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Docket No. 1:20-cv-00468-NT |

## ORDER ON CROSS-MOTIONS FOR JUDGMENT

Plaintiffs High Street Capital Partners, LLC ("**High Street**") and Northeast Patients Group d/b/a Wellness Connection of Maine ("**Wellness Connection**") allege that Maine's medical marijuana licensing program violates the dormant Commerce Clause by restricting licenses to residents and resident-owned entities. The Plaintiffs have sued the Maine Department of Administrative and Financial Services ("**the Department**" or "**DAFS**") and the Department's Commissioner, Kirsten Figueroa.[1] Both parties have moved for judgment on a stipulated record (ECF Nos. 14 and 17). I held oral argument via videoconference on July 16, 2021 (ECF No. 25). For the reasons set forth below, the Plaintiffs' motion is **DENIED** as to the Department and **GRANTED** as to Commissioner Figueroa, and the Defendants' motion is **DENIED**.

---

[1] The Complaint mistakenly captioned the Commissioner's first name as "Kristine." *See* Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot for J. on the Record ("**Defs.' Mot.**") 1 n.1 (ECF No. 17).

## BACKGROUND

In 2009, the Maine Legislature amended the State's existing medical marijuana law to establish a comprehensive system authorizing the sale of medical marijuana. Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot. for J. on the Record ("**Defs.' Mot.**") 2 (ECF No. 17). The current iteration of the law—the Maine Medical Use of Marijuana Act (the "**Act**")—authorizes qualified patients who have a certification from a medical provider for the medical use of marijuana to possess, use, and purchase medical marijuana. Defs.' Mot. 3; 22 M.R.S.A. § 2423-A. The Act also authorizes two types of entities—registered dispensaries and caregivers—to possess, cultivate, and sell marijuana to qualified patients. Defs.' Mot. 3; 22 M.R.S.A. §§ 2423-A(2), 2428. While dispensaries and caregivers can engage in similar activities, dispensaries—by statutory design—engage in operations that are much larger than caregivers. For example, caregivers are limited in the number of plants that they can grow and sell, *see* 22 M.R.S.A. § 2423-A(2), whereas dispensaries can grow an unlimited amount, *see* 22 M.R.S.A. § 2428(1-A). As of February 2021, there were approximately 3,000 caregivers in the State, and seven dispensaries. Pls.' Br. in Supp. of J. on the Record ("**Pls.' Mot.**") 3–4 (ECF No. 14). Caregivers accounted for 76 percent of retail sales as of February 2020, with dispensaries accounting for the remaining 24 percent. Pls.' Mot. 3–4. Together, the medical marijuana industry generated over $110 million in sales in 2019. Compl. ¶ 1.

Although dispensaries can grow more marijuana plants, they are restricted in other ways, including the restriction that is at the center of this case. The Act provides

2

that "[a]ll officers or directors of a dispensary[2] must be residents of this State," (the "**Dispensary Residency Requirement**"). 22 M.R.S.A. § 2428(6)(H). "Officer or director" is defined as "a director, manager, shareholder, board member, partner or other person holding a management position or ownership interest in the organization." 22 M.R.S.A. § 2422(6-B). "Resident of the State" is defined as "a person who is domiciled in the State." 22 M.R.S.A. § 2422(13-B).

Plaintiff High Street is a Delaware limited liability company entirely owned by residents of states other than Maine. Joint Stipulation of the Record ("**Record**") ¶ 1 (ECF No. 13-1). Plaintiff Wellness Connection owns and operates three of the seven registered dispensaries in Maine's medical marijuana program. Record ¶ 2. From June of 2010 until March of 2020, Wellness Connection operated as a mutual benefit nonprofit corporation without any equity ownership, but when Maine changed its law in 2020 to allow dispensaries to become for-profit companies, Wellness Connection converted to a for-profit corporation and is currently wholly owned by three Maine residents. Record ¶¶ 3–5. High Street states that it would purchase all of the equity in Wellness Connection if the Dispensary Residency Requirement did not prohibit it from doing so.

The Plaintiffs sued the Department—which is responsible for implementing, administrating, and enforcing the Act—and Kirsten Figueroa, who is the

---

[2]   A "dispensary" is defined as "an entity registered under section 2425-A that acquires, possesses, cultivates, manufactures, delivers, transfers, transports, sells, supplies or dispenses marijuana plants or harvested marijuana or related supplies and educational materials to qualifying patients and the caregivers of those patients." 22 M.R.S.A. § 2422(6).

3

Commissioner of DAFS. *See* Record ¶¶ 7–8. The Plaintiffs allege that the Dispensary Residency Requirement violates the dormant Commerce Clause because it explicitly discriminates against residents of other states and Maine cannot show a legitimate local purpose for the requirement.

United Cannabis Patients and Caregivers of Maine ("**United Cannabis**") intervened in this case. (ECF Nos. 11, 16.) United Cannabis opposes the Plaintiffs' motion for judgment and partially opposes the Defendants' motion. *See* ECF Nos. 20, 22.

## LEGAL STANDARD

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Although the Commerce Clause only contains an affirmative grant of power, "[o]ver time, courts have found a negative aspect embedded in this language—an aspect that prevents state and local governments from impeding the free flow of goods from one state to another." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999). This "dormant Commerce Clause" prohibits "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 10 (1st Cir. 2007) (internal quotations omitted); *see also Davis*, 553 U.S. at 337–38. The dormant Commerce Clause is intended "to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation . . . that had plagued relations among the Colonies and later

among the States under the Articles of Confederation." *Davis*, 553 U.S. at 337–38 (internal quotations and citations omitted and alterations adopted).

To this end, a state or local law that "discriminates on its face against interstate commerce, whether in purpose or effect, demands heightened scrutiny." *Wine & Spirits Retailers*, 481 F.3d at 10. I must invalidate such a law "unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means."[3] *Id.* at 10–11; *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019) ("[A] state law [that] discriminates against out-of-state goods or nonresident economic actors . . . can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose.") (internal quotations omitted and alterations adopted). The plaintiff bears the initial burden of showing discrimination, but the state or local government bears the burden of identifying legitimate local purposes and establishing a lack of non-discriminatory alternatives. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

Importantly, congressional action can alter the application of the dormant Commerce Clause. As the Supreme Court recently stated, "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2465. Thus, Congress "may use its powers under the Commerce Clause to

---

[3] Statutes that "regulate[ ] evenhandedly and ha[ve] only incidental effects on interstate commerce engender[ ] a lower level of scrutiny." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007) (internal quotations omitted). Such statutes "will stand 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.' " *Id.* (alteration in original) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

5

'[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.' " *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (alteration in original) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980)). The standard for finding such congressional consent is "high," and the state has the burden of demonstrating Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 570 (1st Cir. 1996); *see also Maine v. Taylor*, 477 U.S. 131, 138–39 (1986) ("[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.' "); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430–32 (3d Cir. 2011).

## DISCUSSION

### I.  Claims Against the Department

As a threshold issue, the Defendants assert that the Department is immune from suit under the Eleventh Amendment because it is an "arm of the state." Defs.' Mot. 2, 15–17. The Plaintiffs did not respond to this argument in their opposition brief.[4]

---

[4]  The Intervenor opposed the Defendants' motion for judgment, but their opposition focuses solely on whether the claims against *Commissioner Figueroa* are barred by the Eleventh Amendment. *See* Intervenor's Opp'n to Defs.' Cross-Mot. for J. on the Record 1–2 (ECF No. 22). The Defendants' motion, however, only argues that the *Department* is immune from suit.

6

I agree that the Department is shielded from suit in federal court. "Long interpreted as an affirmation of state sovereign immunity," the Eleventh Amendment bars individuals—regardless of their citizenship—from bringing a federal court action against a state, "including instrumentalities of the state, such as state agencies." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015) (quotations and citations omitted); *see also PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). By statute, the Department "is established as the principal fiscal department of State Government." 5 M.R.S.A. § 281. It is responsible for "coordinat[ing] financial planning and programming activities of departments and agencies of the State Government for review and action." *Id*. Like other Maine agencies, the Department is not "independent and separate," but rather is an arm of the State shielded by the Eleventh Amendment from suit in federal court. *See Abdisamad v. City of Lewiston*, No. 2:19-CV-00175-LEW, 2019 WL 2552194, at *2 (D. Me. June 20, 2019) (quoting *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63 (1st Cir. 2003)) (holding that the Maine Department of Agriculture, Conservation and Forestry is an arm of the State); *United Cannabis Patients & Caregivers of Me. v. Me. Dep't of Admin. & Fin. Servs.*, No. 1:20-cv-00388-NT, 2021 WL 1581767, at *5 (D. Me. Apr. 22, 2021). No party argues that the State has consented to suit against the Department in this context or that the State's sovereign immunity has otherwise been abrogated. I conclude that the Plaintiffs' claims against the Department must fail.

In addition to claims against the Department, the Plaintiffs seek injunctive relief against the Commissioner. The State does not contend that these claims are barred by sovereign immunity, *see Ex parte Young*, 209 U.S. 123, 159–60 (1908); *O'Connor*, 786 F.3d at 138–39, so I go on to address the merits of the Plaintiffs' claims against the Commissioner.

## II. Claims Against the Commissioner

This case raises a novel question, and it involves a unique scenario in the Commerce Clause realm. The Controlled Substances Act ("**CSA**") makes it unlawful under federal law "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841. Marijuana is classified as a Schedule I drug under the CSA. 21 U.S.C. § 812(c)(Schedule I)(c)(10). Although Congress has barred the Department of Justice from using funds "to prevent any [state] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana," *see* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 § 531, 134 Stat. 1182, 128283 (2020) ("**Rohrabacher-Farr Amendment**"), Congress has not amended the CSA to legalize marijuana for either medical or recreational use. And the Supreme Court has held that the CSA is a valid exercise of Congress's Commerce Clause power, even where it criminalizes the cultivation and possession of marijuana for personal use. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). What this means, then, is that the federal government could prosecute various actors in Maine's medical marijuana industry at any time.

Against this backdrop, the Plaintiffs recite traditional arguments about the dormant Commerce Clause. They assert that the Dispensary Residency Requirement violates the dormant Commerce Clause because it plainly favors Maine residents over residents of other states. Noting that Maine's medical marijuana industry is booming, Pl.'s Mot. 3, the Plaintiffs argue that the requirement "reserves . . . enormous economic opportunities . . . for long-term residents," excluding non-residents from participating in "the largest and most lucrative type of medical marijuana business[ ] in Maine," Pls.' Mot. 7–8. And the Plaintiffs emphasize that the requirement "facially discriminates against non-residents" and thus is "virtually per se invalid." Pl.'s Mot. 8 (quoting *Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 575 (1997)).

The Defendants and Intervenor emphasize the unique context of *this* dormant Commerce Clause challenge. At oral argument, the Defendants pointed out that, at its core, the dormant Commerce Clause is not about protecting individual rights but rather about preserving a national market and prohibiting state laws that interfere with that national market. The Defendants do not argue that there is any justification for the Dispensary Residency Requirement that could overcome a constitutional challenge. Rather, they argue that Congress has eliminated the national market for marijuana and thus there is no national market with which Maine can interfere.[5]

---

[5] The Defendants contend that the Supreme Court's decision in *General Motors Corp. v. Tracy* "provides a roadmap . . . and confirms that the dormant Commerce Clause should not be applied to a state market without considering the doctrine's inherent purpose." Defs.' Mot. 8 (citing 519 U.S. 278 (1997)). More specifically, the Defendants argue that, because the dormant Commerce Clause's "fundamental objective is preserving a national market for competition," Defs.' Mot. 9 (quoting *Tracy*, 519 U.S. at 299), there can be "nothing left for the dormant Commerce Clause to protect" where "Congress has eliminated [that] market," *id.*

9

Defs.' Mot. 4, 6–7. In other words, the Defendants argue that, "[i]n the most 'active' way imaginable, Congress has flexed its Commerce Clause powers and placed marijuana proprietors on notice that they enjoy no federal protections in the interstate market—because there is no such market."[6] Defs.' Mot. 9–10. And thus, the Defendants contend, the Dispensary Residency Requirement does not violate the dormant Commerce Clause.[7]

The Defendants' argument is not without logic, but I see several issues with it. First, the notion that the medical marijuana industry in Maine is wholly intrastate does not square with reality. Maine does not prevent qualified nonresidents from purchasing marijuana for medical use at Maine facilities, *see* 22 M.R.S.A. § 2423-D.

---

I agree that the dormant Commerce Clause's purpose is important, but I find *Tracy* to be distinguishable. In that case, the Supreme Court upheld a state law that taxed out-of-state natural gas marketers differently from state-regulated natural gas utilities. 519 U.S. at 293, 299. After a detailed review of the development of the natural gas retail market, the Court held that these two entities were not comparable for dormant Commerce Clause purposes because the requirements placed on local suppliers meant that they were essentially providing a different, bundled product. *Id.* at 297–98. With different products, the Court explained, "there is a threshold question whether the companies are indeed similarly situated for constitutional purposes" because a "difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Id.* at 299. In other words, eliminating the "regulatory differential [may] not serve the dormant Commerce Clause's fundamental objective." *Id.* Here, the Plaintiffs are trying to break into Maine's existing medical marijuana market and compete directly with resident-owned entities. There is no indication that they would be providing a fundamentally different product. Given the reality that an interstate market for medical marijuana does seem to exist despite the Controlled Substances Act ("**CSA**"), eliminating the Dispensary Residency Requirement *would* serve the dormant Commerce Clause's fundamental objective by "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.*

[6]     At oral argument, the Defendants added that, from a practical stand point, it would not make sense for Congress to criminalize the interstate market while also offering parameters that would permit it—such as by making it expressly clear that states can treat resident and nonresident actors differently.

[7]     The Intervenor took a slightly different approach. It contends that there is nothing "dormant" about Congress's Commerce Clause power in this context where Congress "has exercised its affirmative Commerce Clause powers to exclude marijuana from any national market of interstate commerce." Intervenor's Opp'n to Pls.' Mot. for J. on the Record 6 (ECF No. 20).

10

Nor does Maine seem to prohibit nonresidents who purchase marijuana here from taking it home with them. And Maine appears to allow nonresidents to participate in some aspects of the medical marijuana market.[8] *See, e.g.,* 22 M.R.S.A. § 2423-F (law governing marijuana extraction facilities not limited to residents).

Second, the Defendants have the burden of showing Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers*, 77 F.3d at 570. The CSA says nothing about eliminating a national market, but merely criminalizes various acts of possession, manufacture, and distribution of controlled substances.[9] The Rohrabacher-Farr Amendment further muddies the question of congressional intent.

Finally, the Defendants cite no authority for their position. Instead, in apparently all cases where federal courts have confronted dormant Commerce Clause challenges to state or local laws that favor residents in the recreational or medical marijuana context, the courts have held that such laws are likely unconstitutional.[10]

---

[8]   In addition, because the Defendants have declined to enforce the residency requirement for adult-use marijuana licenses after a legal challenge, *see* Stipulation of Dismissal, *NPG, LLC, et al. v. Dep't of Admin. and Fin. Servs., et al.*, No. 1:20-cv-00107-NT (May 11, 2020) (ECF No. 9), nonresidents are currently able to participate in that market too.

[9]   The Defendants argue that the CSA made marijuana contraband. But, as with their argument regarding Congress's "eliminat[ion]" of the marijuana market, they cite no authority holding that a product that is contraband under federal law but a valuable commodity under state law is outside the scope of the dormant Commerce Clause.

[10]   One court recently reached a different resolution. In *Original Investments, LLC v. Oklahoma*, the district court dismissed the plaintiff's dormant Commerce Clause challenge to an Oklahoma statute that prohibits nonresidents from obtaining medical marijuana business licenses and from owning more than 25 percent of any such licensed entity. Case No. CIV-20-820-F, 2021 WL 2295514 (W.D. Okla. June 4, 2021). Sidestepping the dormant Commerce Clause issue, the court held that it should not use its equitable power to facilitate conduct—namely enabling nonresidents to obtain licenses to sell medical marijuana—that is illegal under federal law. *See id.* at *3.

11

*See Toigo v. Dept. of Health and Senior Servs.*, No. 2:20-cv-04243-NKL (W.D. Mo. June 21, 2021) (ECF No. 25) (granting preliminary injunction enjoining state agency from restricting medical marijuana licenses to businesses that are majority-owned by persons who have been residents for more than one year because such a requirement was discriminatory on its face); *Lowe v. City of Detroit*, No. 21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021) (granting motion for preliminary injunction and holding that city ordinance that granted preferential treatment to long-time residents in awarding licenses was a form of economic protectionism that violated the dormant Commerce Clause); *NPG, LLC v. City of Portland*, No. 2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020).

These courts recognized that the law or ordinance at issue was "the sort of economic protectionism that the Supreme Court has long prohibited." *See Lowe*, 2021 WL 2471476, at *9 (citing *Davis*, 553 U.S. at 337–38). In those cases, as here, the defendants had not shown "unmistakably clear" intent from Congress to authorize states to discriminate in this way.[11] *See United Egg Producers*, 77 F.3d at 570; *see also South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 91–92 (1984) (explaining that the "requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine"). I have no authority to invent such an affirmative grant where

---

[11] Although the CSA criminalizes marijuana, it does not affirmatively grant states the power to "burden interstate commerce 'in a manner which would otherwise not be permissible.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (quoting *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945)).

Congress has not provided it. *See New England Power Co.*, 455 U.S. at 343 ("[W]hen Congress has not expressly stated its intent and policy to sustain state legislation from attack under the Commerce Clause, . . . [courts] have no authority to rewrite its legislation based on mere speculation as to what Congress probably had in mind." (internal quotations and citations omitted)).

I recognize that none of the courts that have confronted this specific constitutional issue have rendered final judgments, and it also seems that no circuit court has addressed it. But given the Supreme Court's and First Circuit's unmistakable antagonism towards state laws that explicitly discriminate against nonresident economic actors, I conclude that the Dispensary Residency Requirement violates the dormant Commerce Clause.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for judgment on the stipulated record as to Defendant Figueroa, **DISMISSES** the claims against Defendant DAFS, and **DENIES** the Defendants' motion for judgment on the stipulated record. The Commissioner shall be enjoined from enforcing the Dispensary Residency Requirement.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 11th day of August, 2021.